FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-30044 |
| *Plaintiff-Appellant*, | D.C. Nos. 1:19-cr-02032-SMJ-1 1:19-cr-02032-SMJ |
| v. | |
| JAMES DEAN CLOUD, | |
| *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Salvador Mendoza, Jr., District Judge, Presiding

Argued and Submitted December 8, 2023
Seattle, Washington

Filed May 21, 2024

Before: M. Margaret McKeown, N. Randy Smith, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Criminal Law/Sanctions

The panel affirmed the district court's order, imposed under its exercise of supervisory powers, directing the Government to pay monetary sanctions as reimbursement for the time spent getting to the bottom of the Government's nondisclosure of information suggesting that its star witness in a criminal trial was willing to shape her testimony in exchange for certain benefits.

The panel held that this court has appellate jurisdiction under 28 U.S.C. § 1291 because the sanctions order, from which the Government filed a timely notice of appeal several months before final judgment issued in the underlying criminal case, satisfied the elements of the collateral-order doctrine.

On the merits, the panel addressed the three components of a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963). The first component, favorability, was not in dispute. As to the second component, suppression, the panel held that clear error review applies to a district court's factual findings in the *Brady* context, and that given the record and the district court's findings, the evidence was suppressed. As to the third component, materiality, the panel agreed with the district court that the Government's suppression prejudiced the defendant under the materiality standard applicable to withheld evidence discovered before or during trial. The panel wrote that the district court's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

decision to exclude the testimony and impose sanctions was not an abuse of discretion; the district court's approach—declining to dismiss the indictment and cabining the remedy to witness exclusion and a monetary sanction—was a reasonable response to the Government's conduct and correct as a matter of law. The panel held that the district court did not violate the Government's sovereign immunity by imposing monetary sanctions under an exercise of its supervisory powers.

## COUNSEL

William A. Glaser (argued), Attorney, Civil Division; Lisa H. Miller, Deputy Assistant Attorney General; Kenneth A. Polite, Jr., Assistant Attorney General; United States Department of Justice, Washington, D.C.; Russel E. Moot, Assistant United States Attorney, Eastern District of Washington; David M. Herzog, Assistant United States Attorney; Vanessa R. Waldref, United States Attorney; Office of the United States Attorney, Spokane, Washington; for Plaintiff-Appellant.

Colin G. Prince (argued), Chief Appellate Attorney; Federal Defenders of Eastern Washington & Idaho, Spokane, Washington; Lorinda M. Youngcourt, Assistant Federal Public Defender; Federal Public Defenders of Eastern Washington & Idaho, Spokane, Washington; Paul E. Shelton, Jr., Federal Defenders of Eastern Washington & Idaho, Yakima, Washington; Jeremy B. Sporn, Assistant Federal Public Defender; Office of the Federal Public Defender, Albany, New York; John B. McEntire, IV, Connelly Law Offices PLLC, Tacoma, Washington; for Defendant-Appellee.

# OPINION

McKEOWN, Circuit Judge:

In the midst of a complicated five-body homicide trial, the district court learned that the Government failed to turn over information suggesting that its star witness, Esmeralda Z., was willing to shape her testimony in exchange for certain benefits. The defense did not learn of this turn of events from the Government. Rather, the night before the witness was expected to testify, her counsel alerted defense counsel of text messages that implicated Esmeralda's credibility. Defense counsel informed the court, and after hearing testimony that revealed additional troubling details, the court entered an order sanctioning the Government for violating James Cloud's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). The court excluded the witness and ordered the Government to pay a modest monetary sanction as reimbursement for the time spent getting to the bottom of the nondisclosure.

Not only did the Government suppress evidence, but that suppression was material under *Brady*. Consistent with our circuit precedent, we affirm the monetary sanctions against the Government, which were imposed under the district court's exercise of supervisory powers, and we reject the Government's argument that sovereign-immunity principles bar the sanctions. *See United States v. Woodley*, 9 F.3d 774, 782 (9th Cir. 1993).

## BACKGROUND

James Cloud was charged with multiple offenses, including five counts of murder, for crimes committed on an Indian reservation in 2019. At his March 2022 trial, the

Government planned to call witnesses to identify Cloud as the killer, including Esmeralda, who was scheduled to take the stand during the afternoon of the trial's second day.

Esmeralda was, by all accounts, a key Government witness. The only other witnesses expected to identify Cloud as the shooter—one, an accomplice who testified as part of a plea deal and the other, Cloud's cellmate who testified hoping to get his federal-drug-trafficking sentence reduced—agreed to testify in exchange for conferred or potential benefits. That left Esmeralda as the sole disinterested witness expected to name Cloud as the killer in two of the charged murders. Indeed, weeks before trial—when law enforcement was having trouble locating her—the district court granted the Government's request to designate her as a material witness and authorized a material witness arrest warrant to secure her presence. After Esmeralda was arrested on that warrant in February 2022, the district court appointed an attorney to represent her.

The night before Esmeralda's scheduled testimony, her boyfriend, James S., sent a text message to the lead FBI agent on the case, Troy Ribail. That message referenced James's pending weapon and drug charges in a different county in Washington:

> Hi it's James what can we do about my stuff in Kittitas [C]ounty. I've been more than willing to help you guys out and still am cause she wants to go in there and ple[ad] the 5th and say she don't remember anything and is even thinking about taking off. I need my [Kittitas] stuff to go away you guys need her testimony sayi[n]g which one shot who. . . . I need my charges gone so I can get to work

> and move on in my life.  She will testify to
> whatever you need her to if you can make that
> happen.

Soon after Ribail received this message, he called Esmeralda.  It was clear that James was with Esmeralda and listening in on a speakerphone, as he started yelling at Ribail towards the end of the call.  After the call ended, James texted Ribail again at 7:20 PM: "So ju[s]t so I understand correctly y[o]u are no longer going t[o] help with relocation or any kind of protection for my girl and our family correct? S[o] you were just blowing smoke up our asses yesterday?" A few minutes later, an Assistant United States Attorney called Esmeralda's attorney to inform him of James's text messages and to request a meeting with Esmeralda and her lawyer the next day during the morning trial break, because prosecutors were concerned that she might not comply with her subpoena.  A few hours later and after having obtained a waiver of the attorney-client privilege, Esmeralda's attorney—who knew defense counsel personally—phoned Cloud's attorney to inform him of the text messages.

The next morning before court was called into session (and with Esmeralda scheduled to testify that afternoon), Cloud's attorney asked prosecutors whether there was anything they wanted to bring up—they responded that there was not.  Shortly after court began and just minutes before jury proceedings were set to commence, Cloud's attorney notified the district court that he had become aware of James's text messages, which the Government had not disclosed.

The district court excused the jury and called witnesses to unravel the chronology and history of the nondisclosure. Esmeralda confirmed that she was aware that James had

texted Ribail, and that he did so with her approval. Esmeralda also revealed that, starting about two weeks before, she had had discussions with Ribail about relocating for safety reasons after her testimony. She explained that James's text message reflected their hope that the Government would help resolve his pending charges so that they could move to another state together. Esmeralda also testified that in the days prior to her scheduled testimony, Ribail had told her that he would help with money for a down payment "or whatever was necessary." Esmeralda stated that she had given Ribail a list of the funds she needed, including housing expenses and relocation costs. She had been pushing Ribail to commit these promises to writing, but he told her there "wasn't enough time." Days earlier, Esmeralda had texted Ribail: "I'm so mad and confused. Idk if ur trying to lose a big case but we need to talk."[1]

Finally, Esmeralda admitted on the stand that she was willing to shape her testimony in exchange for receiving these benefits. When asked, "[Y]ou were willing to say whatever they wanted you to say . . . . That's what you were willing to do, correct?," she responded, "Yeah." The court then followed up with a final question: "You were willing to change your testimony based upon whether or not you got this benefit; is that right?" Esmeralda offered an unequivocal "Yes" in response.

The Government never disputed Esmeralda's testimony, nor did it ever disclose any of this information to defense counsel. Ribail—who testified before Esmeralda for around 43 minutes—admitted that he had been communicating with Esmeralda and James for several weeks to locate Esmeralda

---

[1] The court learned of this text message after it ordered Ribail to produce his text messages with Esmeralda and James.

and to coordinate her witness preparation, but he never disclosed in testimony before the district court any discussions of relocation or financial assistance. Those discussions only came to light when Esmeralda testified after Ribail.

After hearing this testimony, the Government indicated that it would not call Esmeralda as a witness, and the district court stated that it would exclude her because she was unreliable. The court then made a finding that the Government's "egregious" conduct violated *Brady*, and stated that it would sanction the Government accordingly. The next day, the court reiterated that sanctions would be forthcoming, and ordered the defense to submit an accounting of time and expenses spent dealing with the matter, excluding what the defense reasonably would have spent had it been given timely notification of the impeachment material and had Esmeralda testified. A week later, on March 9—the same day that the jury entered a verdict convicting Cloud on thirteen counts, including four counts of first-degree murder[2]—the district court issued a sanctions order, directing the Government to pay $4,844.68 (an amount that reflected the defense's accounting) to the Federal Defenders of Eastern Washington & Idaho and $216.00 (the amount paid to jurors while they sat idle) to the district court clerk.[3]

---

[2] Cloud was acquitted on one of the first-degree murder charges. His convictions were affirmed in a memorandum disposition. *See United States v. Cloud*, No. 22-30173, 2024 WL 49808 (9th Cir. Jan. 4, 2024).

[3] The Government acknowledged during oral argument that it does not challenge the accounting or amount of the sanctions.

## ANALYSIS

### I. Appellate Jurisdiction

This case presents an unusual situation. The Government filed a timely notice of appeal of the sanctions order two weeks after the district court issued the order, but several months before final judgment issued in the underlying criminal case. The Government asserts jurisdiction under 28 U.S.C. § 1291, or alternatively under 28 U.S.C. § 1651(a) as a petition for a writ of mandamus. It goes without saying that it is atypical for us to hear an appeal from the Government after it has obtained a conviction.

Nonetheless, we conclude that we have appellate jurisdiction under 28 U.S.C. § 1291, because the sanctions order here satisfies all three elements of the collateral-order doctrine, in that it "(1) conclusively determine[d] the disputed question, (2) resolve[d] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 522 (1988) (internal quotation marks omitted) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).[4]

To begin, the order conclusively determined the issue of the *Brady* violation. The order was not "tentative, informal or incomplete," nor did it leave any part of the issue "open, unfinished or inconclusive." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The order resolved an important issue—the consequences of the Government's withholding of impeachment information from defense counsel—separate from the ultimate merits of the underlying

---

[4] We do not address the petition for a writ of mandamus in view of this holding.

action, which in this case is Cloud's criminal conviction. And finally, the order was not a "step toward final disposition of the merits" and was not "merged in [the] final judgment," because the judgment in a criminal case runs to the defendant and reflects only his conviction and sentence. *Id.* In this posture, the order is "effectively unreviewable on appeal from a final judgment." *Biard*, 486 U.S. at 522 (quoting *Coopers*, 437 U.S. at 468).

To be sure, we are mindful of the Supreme Court's repeated admonitions that the "class of collaterally appealable orders must remain 'narrow and selective in its membership.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 113 (2009) (quoting *Will v. Hallock*, 546 U.S. 345, 350 (2006)). In this vein, we have "interpret[ed] the collateral order doctrine with the 'utmost strictness' in criminal cases," *United States v. Lewis*, 368 F.3d 1102, 1105 (9th Cir. 2004) (quoting *California v. Mesa*, 813 F.2d 960, 962 (9th Cir. 1987)), and have thus generally limited "review of interlocutory appeals in criminal cases 'to instances . . . where there are statutory or constitutional guarantees against the defendants standing trial,'" *United States v. Austin*, 416 F.3d 1016, 1022 (9th Cir. 2005) (alteration in original) (quoting *United States v. Hickey*, 367 F.3d 888, 896 (9th Cir. 2004)).

We have, however, long taken a "pragmatic approach to finality in situations where events subsequent to a nonfinal order fulfill the purposes of the final judgment rule." *Dannenberg v. Software Toolworks, Inc.*, 16 F.3d 1073, 1075 (9th Cir. 1994); *see also Anderson v. Allstate Ins. Co.*, 630 F.2d 677, 681 (9th Cir. 1980) (explaining that this court takes "a practical rather than a technical construction to the finality rule, without sacrificing the considerations underlying that rule," whereby "subsequent events can

validate a prematurely filed appeal"). This practical approach counsels in favor of our conclusion that appellate jurisdiction is proper here. Because the district court entered final judgment against Cloud in the underlying criminal case before we heard this appeal, we are not confronted with any risk of "piecemeal appeals and concomitant delays" of the sort that "the final judgment rule was designed to prevent," *Cunningham v. Hamilton County*, 527 U.S. 198, 209 (1999), for "nothing else remains in the federal courts," *Anderson*, 630 F.2d at 681.**5**

We now turn to the merits of the sanctions order.

## II. *Brady* Violation

Under the rule first announced by the Supreme Court in the landmark case of *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Giglio v. United States*, the Court further clarified that nondisclosure of evidence that would impeach the credibility of a key witness "falls within this general rule." 405 U.S. 150, 154 (1972). The Court has counseled that a due process violation under *Brady* and *Giglio* has "three components": "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the [government], either

---

[5] Given the unique posture of this appeal, our jurisdictional analysis should not be read to give litigants carte blanche to lodge an interlocutory appeal from any district court *Brady* order. Rather, under different circumstances, "appealability [might] present a different question." *Cohen*, 337 U.S. at 547.

willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

### A. Favorability

Favorability is not in question: "[E]vidence that has any . . . impeachment value is, by definition, favorable." *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (citation omitted).  The district court correctly concluded—and the Government does not dispute—that the first *Brady* prong was thus satisfied.  Evidence that Esmeralda, a material witness, was negotiating financial benefits for her testimony squarely put her credibility into doubt.  Likewise, evidence that Esmeralda's boyfriend attempted to bargain with a federal agent in exchange for her favorable testimony did the same.  Esmeralda's admission that although she was somewhat confused about what happened during the shooting, she was willing to nonetheless "change" her testimony and say "whatever" the Government "wanted [her] to say" is classic impeachment evidence.

### B. Suppression by the Government

Our circuit has "not resolved how much deference must be afforded a district court's factual findings in the context of a *Brady* challenge." *United States v. Garcia-Gonzalez*, 791 F.3d 1175, 1181 n.6 (9th Cir. 2015) (citation omitted).  The Government acknowledges that the suppression determination—which is intrinsically bound up in a district court's factual findings—is likely entitled to deferential review.  We agree and join our sister circuits in holding that clear error review applies to a district court's factual findings in the *Brady* context.  *See United States v. Edwards*, 34 F.4th 570, 587 (7th Cir. 2022) (clear error); *United States v. Caldwell*, 7 F.4th 191, 208 (4th Cir. 2021) (clear error); *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018)

(deferential review); *United States v. Davis*, 863 F.3d 894, 908 (D.C. Cir. 2017) (deferential review); *United States v. Garcia*, 793 F.3d 1194, 1205 (10th Cir. 2015) (clear error); *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (factual findings "entitled to great weight"); *United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993) (clear error); *United States v. Sanchez*, 917 F.2d 607, 618 (1st Cir. 1990) (deferential review).

This framework is consistent with our approach to other mixed questions of law and fact in criminal cases, whereby "a trial court's legal conclusions" are reviewed "de novo, and findings of fact underlying those conclusions for clear error." *United States v. Rodriguez*, 518 F.3d 1072, 1076 (9th Cir. 2008) (describing the standard of review for *Miranda* waivers); *see also United States v. Dorais*, 241 F.3d 1124, 1128 (9th Cir. 2001) (applying same standard-of-review framework to the question of whether a defendant has standing to challenge a search under the Fourth Amendment). As such, "once the existence and content of undisclosed evidence has been established," we review de novo the ultimate legal conclusion that evidence was suppressed, just as we review de novo all questions of law in the *Brady* context. *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007).

Evidence is "suppressed" when it is known to the government but not disclosed to the defendant. *Comstock*, 786 F.3d at 709 (citation omitted). "As a matter of law, the prosecution is deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *United States v. Bundy*, 968 F.3d 1019, 1037 (9th Cir. 2020) (internal quotation marks and citation omitted). This principle is particularly salient here, as the

lead FBI agent failed to disclose the information in a timely manner. And, of course, it makes sense that "[d]isclosure, to escape [a] *Brady* sanction, must be made at a time when the disclosure would be of value to the accused." *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985) (citation omitted).

The "duty to disclose is affirmative"—the Government's obligation is not contingent on a request by the accused. *Comstock*, 786 F.3d at 709; *see also* E.D. Wash. Crim. R. 16(a). Though the defense need not request *Brady* material, it bears noting that Cloud proactively sought—well in advance of trial—assurance that the Government would honor its constitutional obligations. In November 2020, Cloud asked the district court to give a more detailed warning under the Due Process Protection Act that would "put prosecutors on notice about their disclosure obligations" and clarify precisely what those obligations are. In response, the Government took the position that the proposed order was unnecessary, as "[t]he United States is well aware of its duties under *Brady*." Hindsight suggests otherwise.

Indeed, at the *Brady* hearing regarding impeachment evidence related to Esmeralda, the district court expressed incredulity surrounding the failure to disclose:

> THE COURT: I just can't for the life of me think of a reason why the information that was provided to the agent first and then to the US Attorneys was not immediately turned over to the defense. I can't think of a reason. I just can't. . . .

> This witness was going to testify today, so the Government sat on that information 7 o'clock, 8 o'clock, 9 o'clock, 10 o'clock, 11 o'clock, midnight, 1 o'clock, 2 o'clock, 3 o'clock, 4 o'clock, 5 o'clock, 6 o'clock, 7 o'clock, 8 o'clock. 8:30, we come to court and still nothing? That's offensive.

> I don't know what the Government's going to do with regards to that witness, but the Court will exclude her as unreliable. She indicated that she would be willing to do whatever it takes, even provide false testimony. I'm not going to allow that.

In view of this context, the district court held that the Government "plainly suppressed" evidence about Esmeralda and James. The record readily supports this conclusion. Indeed, the Government never disclosed to the defense *any* impeachment evidence about Esmeralda—not any conversations with Ribail that had taken place in the weeks preceding trial about financial and relocation assistance, nor her boyfriend's text messages—despite ample opportunity and the existence of a standing order that directed the Government "to produce all exculpatory evidence to the defendant pursuant to *Brady*" and warned the Government that "[f]ailing to do so in a timely manner may result in sanctions." Instead, this evidence only came to light through a third party's serendipitous, nick-of-time disclosure to defense counsel just hours before Esmeralda was set to testify.

The Government proffers various post-hoc excuses for its disclosure failures. None are well taken. As the district court observed, the Government's explanations—which ask

us to accept its word for what it might or would have done under circumstances that never actually transpired—are "reminiscent [of] a child whose hand is caught in the cookie jar." Although much of the focus at the hearing was on the eve-of-trial text messages and discussions with James and Esmeralda, just as importantly, the Government failed to disclose that for several weeks Ribail had been conversing with Esmeralda about an "assortment of desired benefits" linked to her testimony, including "funds for a down payment or rent on a home or apartment."

The Government attempts to justify what it characterizes as a temporary withholding of the text messages by arguing that it had reason to doubt whether Esmeralda would comply with her subpoena,[6] and—if she did not—prosecutors planned to apply for a material witness arrest warrant for her and then disclose James's text statements that she wasn't going to show. But this would've-could've proffer fails to explain what, if anything, the Government would have done to disclose the text messages had Esmeralda shown up to take the stand as scheduled that afternoon.

The Government also argues that it had not yet confirmed that Esmeralda herself was aware of James's text messages, and that it thus acted reasonably in trying to meet with Esmeralda and her counsel to determine whether the messages were attributable to her before deciding on a course of action. But when Ribail called Esmeralda

---

[6] The Government points to the statements in James's text messages to support its asserted doubt that Esmeralda would comply with her subpoena. It seems odd for the Government to credit, on one hand, James's statements as indicative of Esmeralda's state of mind regarding her testimony, while maintaining, on the other hand, that it was not sure at the time whether Esmeralda had authorized or was even aware of his text messages.

moments after James sent the first text message, it was clear that the two were together and, as the district court noted, Ribail even "specifically told Esmeralda that he was not going to be trading benefits for her testimony."  The district court rightly observed that this suggested that Ribail—and therefore the Government—"knew Esmeralda's agenda." More fundamentally, it "is not the role of the prosecutor to decide that facially exculpatory evidence need not be turned over because the prosecutor thinks the information is false" or has diminished probative value. *United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996); *see also Comstock*, 786 F.3d at 708–09 ("[W]hether evidence is favorable is a question of substance, not degree, and evidence that has any . . . impeachment value is, by definition, favorable. . . . Once the prosecutor acquires favorable information, [] if she . . . fails to communicate it to the defendant, evidence has been suppressed.").  As the district court explained, evidence that a key witness's boyfriend texted the Government on the eve of her scheduled testimony suggesting that he anticipated receiving benefits in exchange for her testimony has "obvious" impeachment value, even if the Government has not determined with absolute certainty that the witness is on board with the plan.  The Government's constitutional obligation was to promptly inform *defense counsel* of the problematic text messages, not to contact Esmeralda's attorney to discuss prosecutors' concerns that she might not show up to testify.

The Government also contends there was insufficient evidence that it would have disclosed the impeachment information too late for it to be used effectively.  But nothing in the record suggests that at any point before Cloud's attorney revealed James's text messages to the district court, the Government was making plans to either not call

Esmeralda as a witness or to push her testimony back, or that it would have otherwise disclosed the text messages in time to avoid "substantially prejudic[ing]" Cloud "in the preparation" of his defense. *United States v. Baxter*, 492 F.2d 150, 174 (9th Cir. 1973); *see also United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015) (holding that prosecutor's delay in disclosing exculpatory evidence "until the eve of trial" was "inexcusable," as prosecutors had an obligation to turn the information over to the defense as soon as they learned it). The rule is disclosure, not gaming the impact the disclosure might have.[7] Rather than abide by that rule, however, the Government remained silent.

Finally—addressing the district court's finding that the Government failed to disclose that Esmeralda had communicated a "wish list" of negotiated housing and relocation benefits to the FBI in exchange for her testimony—the Government insists that Esmeralda neither received nor was ultimately promised these benefits. Instead, the Government claims these benefits were taken off the table after she was arrested on a material witness warrant. This argument suffers from two significant problems.[8] For

---

[7] The district court reminded the Government of this rule nearly a year and a half before trial, when it chided prosecutors for delaying discovery of certain FBI reports. The district court impressed upon the Government its expectation that "all discovery [would] be produced in this case." The district court also underscored the stakes of delaying disclosure, given that Cloud faced serious charges and potential life imprisonment if convicted: "We're not playing games here."

[8] It also bears mentioning that in its opening brief, the Government failed to even address the district court's finding that it did not disclose these negotiated relocation benefits. The Government only acknowledged this finding in its reply brief, and only *after* Cloud flagged that the district court's *Brady* order was not limited to James's text messages.

one, nothing in the record shows that these promised benefits were withdrawn. To the contrary, James's second February 28 text message suggested that he and Esmeralda had discussed relocation with Ribail just the previous day. And though Esmeralda testified that she discussed these benefits with the Government before her arrest, and that the Government wouldn't oblige her desire to memorialize them in writing, she *never* stated that the benefits were withdrawn at any point. Nor, for that matter, did the Government confirm any withdrawal. In addition, in making this claim, the Government impliedly acknowledges that financial assistance was promised to Esmeralda at some point in the weeks before trial. But it never informed the defense that any such benefits were ever proffered. *See Phillips v. Ornoski*, 673 F.3d 1168, 1183, 1188 (9th Cir. 2012) (prosecution's "failure to divulge" that a prior plea "offer was extended" to a witness violated *Brady*, even where the government argued that the offer was never accepted).

Given the record and the district court's findings (which easily withstand clear error review), we have little trouble concluding that the evidence was suppressed.

### C. Materiality

We now turn to the third component of a *Brady* violation—materiality—which "is a legal matter" that we review de novo. *United States v. Price*, 566 F.3d 900, 907 n.6 (9th Cir. 2009). In evaluating materiality, our *Brady* case law has used "prejudice" and "materiality" interchangeably, and we do so here. *Id.* at 911 n.12.

We agree with the district court that the Government's suppression prejudiced Cloud under the materiality standard applicable to withheld evidence discovered before or during trial. This analysis differs from the traditional *Brady*

scenario in which the government's suppression is discovered *after* a trial and conviction. In the latter, more typical *Brady* scenario, suppressed evidence is deemed material where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (citation omitted). But, as we have observed, this standard "necessarily is a retrospective test, evaluating the strength of the evidence after trial has concluded." *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013). This analytical framework is a poor fit in cases like this one, where the suppression is discovered during trial and before a "look back" is possible.

Our discussion in *United States v. Price*, albeit not a pretrial suppression situation,[9] highlighted this distinction and established a baseline for evaluating *Brady* violations discovered before conviction. As we noted, the "materiality standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials." 566 F.3d at 913 n.14 (alternation in original) (internal quotation marks omitted) (quoting *United States v. Acosta*, 357 F. Supp. 2d 1228, 1239 (D. Nev. 2005)). Rather, we observed that the "proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses." *Id.* (quoting *Acosta*, 357 F. Supp. 2d at 1239). Likewise, in *United States v. Olsen*, we emphasized that "[a]

---

[9] Though *Price* involved withheld impeachment evidence that was uncovered only after the defendant's conviction, the court's clarification of the government's broad pretrial duty of disclosure—which it set forth "[f]or the benefit of trial prosecutors who must regularly decide what material to turn over"—is instructive. 566 F.3d at 913 n.14.

trial prosecutor's speculative prediction about the likely materiality of favorable evidence[] should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial." 704 F.3d at 1183 n.3. We cited approvingly the wisdom of trial courts, which had "concluded that the retrospective definition of materiality is appropriate only in the context of appellate review, and that trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial."[10] *Id.*

These principles were underscored in *United States v. Bundy*, a case in which withheld evidence was discovered days into trial. 968 F.3d at 1026. *Bundy* is particularly instructive. There, we confirmed that when favorable suppressed evidence is discovered mid-trial, the materiality standard is benchmarked against the relative value of the evidence in light of the proceedings to date—not as a retrospective evaluation of how the disclosure may have impacted the outcome of a trial that has not yet concluded. *Id.* at 1033.

---

[10] District courts have for decades recognized this distinct materiality analysis. *See United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1198–99, 1200–01 (C.D. Cal. 1999) (observing that the traditional materiality standard "is only appropriate . . . in the context of [post-conviction] appellate review," because "[w]hether disclosure would have influenced the outcome of a trial can only be determined after the trial is completed" and "obviously cannot be applied by a trial court facing a pretrial discovery request"); *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("The only question before (and even during) trial is whether the evidence at issue may be 'favorable to the accused'; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.").

Although the district court in *Bundy* ultimately declared a mistrial and dismissed the indictment with prejudice as additional withheld evidence trickled in over many days, as here, the production of evidence that "could be useful for impeachment purposes" was untimely. *Id.* at 1028–30. We reiterated the teaching from *Olsen* that "[w]hether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here." *Id.* at 1033. Rather, the materiality inquiry should evaluate the relative value of the withheld evidence "on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point." *Id.* We also suggested that the materiality analysis could consider whether, had the evidence been timely disclosed, it might have altered the prosecution or defense strategy. *See id.* at 1044.

The approach in *Bundy* maps well onto Cloud's case. Like in *Bundy*, the Government's suppression of Esmeralda's impeachment evidence hindered Cloud's ability "to prepare [his] case fully . . . and make stronger opening statements." *Id.* at 1037. Indeed, by the time Esmeralda's impeachment evidence serendipitously came to light, Cloud's counsel had already given opening statements in which he emphasized the biases of the Government's other witnesses. The best attack he could muster on Esmeralda's credibility, however, was that she was high on meth when she witnessed the shootings. Without knowing what the Government was keeping from him, Cloud could not make the more forceful argument that Esmeralda was trading testimony for benefits and that *every* witness who was expected to identify Cloud as the shooter stood to benefit from their testimony. The suppressed evidence was not simply garden-variety impeachment; it was blockbuster

evidence from an eyewitness to two of the murders. Advance knowledge of Emeralda's efforts to bargain for benefits would definitely have shaped the defense strategy.

Absent the nick-of-time disclosure by Emeralda's attorney to defense counsel, the jury would have heard tainted testimony, and defense counsel's cross-examination of Emeralda would not have been informed by the motivation for her testimony. Without the damning impeachment evidence, Esmeralda's identification—that of a mother who was protecting her child from gunshots when she witnessed the murders—would have stood in contrast to the other two witnesses, who were tainted by their dealings with the Government for favorable treatment. Given that Esmeralda's testimony could have been "determinative of guilt or innocence," *Giglio*, 405 U.S. at 154 (citation omitted), this evidence would have "undermine[d] confidence in the outcome of the trial," *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

As the district court put it, even if the Government *had* disclosed the evidence before Esmeralda testified that afternoon—a premise that seems doubtful, since prosecutors remained tightlipped even when Cloud's attorney specifically asked that morning whether there was anything they wanted to bring up—"such a belated disclosure would have" prejudiced the defense, forcing it to "scramble to figure out an appropriate course of action." *See Bundy*, 968 F.3d at 1037 (upholding district court conclusion that the "defendants . . . suffered prejudice in not being able to prepare their case fully"). Even the Government might have altered its strategy had it timely disclosed Esmeralda's impeachment evidence; perhaps, for instance, it would have realized that it might "be difficult to pursue the case it had

promised in the indictment and the opening statement" given that Esmeralda was expected to provide critical, unbiased testimony identifying Cloud as the shooter in two of the charged murders. *Id.* at 1044.

The district court declined to dismiss the indictment, declaring it an "extraordinary remedy [] not warranted here." Instead, the court opted for a less drastic supervisory option, including options laid out in *Bundy*—limiting "testimony offered by the government," or "sanction[ing] the attorneys." *Id.* at 1031. The district court's decision to exclude Esmeralda's testimony and impose sanctions was not an abuse of discretion. *See id.* at 1044. In urging us to hold otherwise, and in arguing that any prejudice was ultimately avoided because Esmeralda did not testify, the Government asks us to create a perverse rule: that it cannot be sanctioned for withholding impeachment evidence about a critical witness whose testimony could have been determinative of guilt or innocence, simply because the district court caught its misconduct *too early*. This argument, if taken to its logical extreme, could risk preventing a trial judge from imposing *any* forward-looking *Brady* sanction under the rationale that there can be no due process violation unless and until the court permits the government's concealment of evidence to fatally taint the trial's result. Our precedents, however, foreclose that argument.

Public trust in our judicial system is reinforced by courts protecting constitutional rights. "When a public official behaves with [] casual disregard for his constitutional obligations and the rights of the accused, it . . . chips away at the foundational premises of the rule of law." *See United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., dissenting from denial of rehearing en banc). For more

than sixty years, *Brady* has treated suppression of material evidence favorable to the accused as a bedrock principle of due process. The district court recognized this foundational principle in explaining its supervisory powers but cabined the remedy to the less drastic remedy of witness exclusion and a monetary sanction. This approach was both a reasonable response to the Government's "egregious conduct," and correct as a matter of law.

## III. Sovereign Immunity

Finally, we consider whether the district court violated the Government's sovereign immunity by imposing monetary sanctions under an exercise of its supervisory powers. *See United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (explaining that a district court may utilize its supervisory powers to implement a range of remedies for governmental misconduct). This question was answered in *United States v. Woodley*: "Sovereign immunity does not bar a court from imposing monetary sanctions under an exercise of its supervisory powers." 9 F.3d at 782. The district court thus did not plainly err in imposing this sanction.[11]

---

[11] We generally review de novo preserved questions of sovereign immunity. *See Woodley*, 9 F.3d at 781. However, our review here is for plain error, because the Government failed to preserve a sovereign-immunity argument even though it was on notice that monetary sanctions for its *Brady* violation were possible (and seemingly likely). *See* Fed. R. Crim. P. 51(b), 52(b); *see also United States v. Palmer*, 643 F.3d 1060, 1066 (8th Cir. 2011) (reviewing the imposition of special conditions, which are "ordinarily" reviewed de novo, for plain error where the government "failed to object" in the district court). On March 2—the day after revelations of the withheld impeachment evidence came to light—the district court stated on the record that sanctions for the Government's *Brady* violation "would be forthcoming," and seconds

We do not countenance the Government's argument that *Woodley*'s statement was dicta.  Nearly thirty years after *Woodley*, we reiterated that we "have construed [a court's supervisory] authority as including a limited power to waive the Government's immunity from sanctions," thereby confirming *Woodley*'s holding.  *Plaskett v. Wormuth*, 18 F.4th 1072, 1086 (9th Cir. 2021) (citing *Woodley*, 9 F.3d at 782); *see also F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 595 (5th Cir. 2008) (stating that *Woodley* "held that '[s]overeign immunity does not bar a court from imposing monetary sanctions'" (quoting *Woodley*, 9 F.3d at 782)).  Importantly, in *Woodley* the sovereign-immunity issue was squarely before us: "We review[ed] de novo whether sovereign immunity bars the imposition of sanctions."  9 F.3d at 781.  After explaining the purposes and limits of supervisory powers, we applied the test for determining whether they permitted sanctions—which are "justified only when a recognized right has been violated."  *Id.* (quoting *United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985)).  Ultimately, we concluded that (unlike this case) sanctions were not justified in part because the record failed to show a violation of the defendant's due process rights.  *Id.*  Here, given our holding that the Government violated Cloud's due process rights, we reach the opposite result.

---

later, in the very next sentence, asked the defense to submit an accounting of time and expense spent on the matter.  That same day, the district court entered a text order stating the same.  But the Government never raised a sovereign-immunity argument below in any form: not orally on the record; not in its March 6, 2022, brief responding to Cloud's request for dismissal of the indictment as a remedy for the Government's *Brady* violations; not in any request for reconsideration of the sanctions order; and not in any other briefing before the district court.

The district court did not err in imposing monetary sanctions on the Government under an exercise of its supervisory powers. Those sanctions were modest and justified.

**AFFIRMED**.