# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: FEBRUARY 19, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2024-SC-0394-MR

MARK SHANNON                                                                    APPELLANT

V.
ON APPEAL FROM BOURBON CIRCUIT COURT
HONORABLE JEREMY MICHAEL MATTOX, JUDGE
NO. 23-CR-00074

COMMONWEALTH OF KENTUCKY                                            APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Bourbon County jury convicted Mark Shannon of theft of an automobile valued at $10,000 or more but less than $1,000,000; second-degree escape; first-degree fleeing or evading police; first-degree wanton endangerment of a police officer; three counts of second-degree wanton endangerment of a police officer; possession of marijuana; operating a motor vehicle with one headlight; and two counts of first-degree criminal mischief. The jury then found him guilty of being a convicted felon in possession of a handgun. The jury recommended the maximum sentence for all offenses to run consecutively for a total of forty-five years. The Bourbon Circuit Court sentenced him to the statutory maximum of twenty years. Shannon appeals to this Court as a matter of right. KY. CONST. § 110(2)(b). After review, we affirm.

## BACKGROUND

In the early morning hours of January 29, 2023, Officer Desirae Thacker of the Paris Police Department stopped Shannon because the vehicle he was driving had only one headlight. After approaching the vehicle, Officer Thacker smelled marijuana coming from the driver's window. Upon her request for Shannon's license, he told her he did not have one and provided false identifying information. Officer Thacker observed Shannon reaching for the vehicle's center console. She told him to stop but he continued to reach toward the console. Once another officer arrived, Officer Thacker ordered Shannon to get out of the vehicle. He complied and was handcuffed and placed in Officer Thacker's patrol vehicle.

The officers searched Shannon's vehicle and recovered marijuana, a loaded handgun from the center console, and a license plate that did not belong to the vehicle. They also found Shannon's driver's license and discovered he had an outstanding warrant in Indiana. They then placed him under arrest.

Because Officer Thacker suffered an unrelated medical emergency, officers moved Shannon to a Dodge Ram police cruiser which belonged to a deputy from the Bourbon County Sheriff's Office. While alone in the vehicle and handcuffed, Shannon moved to the driver's seat and fled the scene in the police vehicle. He then led officers on a high-speed pursuit. During the pursuit, he hit the front of an officer's cruiser, disabling it and flattening one of the Dodge Ram's tires. He continued to flee until the entire wheel came off the vehicle,

2

forcing him to stop. Officers then approached the vehicle and forcibly removed Shannon.

He was charged with theft of an automobile valued at $10,000 or greater but less than $1,000,000; second-degree escape; first-degree fleeing or evading police; first-degree wanton endangerment of a police officer; three counts of second-degree wanton endangerment of a police officer; trafficking in marijuana; operating a motor vehicle with one headlight; and two counts of first-degree criminal mischief. The jury convicted him of all offenses except trafficking, for which they convicted him of the lesser included offense of possession of marijuana. The jury then convicted him of being a convicted felon in possession of a handgun. The jury recommended the maximum sentence for all charges to be served consecutively for a total of forty-five years' imprisonment. The trial court imposed a sentence of twenty years' imprisonment, the maximum sentence allowed by KRS[1] 532.080(6)(b).

This appeal followed.

## ANALYSIS

On appeal, Shannon raises the following arguments which were preserved for appeal: (1) he is entitled to a new trial because of the Commonwealth's late disclosure of evidence that he did not place the gun in the console of the vehicle and (2) the trial court abused its discretion by failing to admonish the jury that the Commonwealth incorrectly identified Shannon as

---

[1] Kentucky Revised Statutes.

3

the sender of a message regarding the gun. Shannon also requests review for palpable error under RCr[2] 10.26 for the following unpreserved errors: (1) during voir dire, the Commonwealth erroneously told jurors to give greater weight to the testimony of law enforcement officers; (2) Shannon's right to a fair trial was violated by Officer Scott Johnson's irrelevant and prejudicial victim impact testimony; and (3) the Commonwealth improperly elicited testimony regarding Shannon's civil lawsuit against the Paris Police Department.

First, Shannon argues he is entitled to a new trial because of the Commonwealth's late disclosure of his communications from jail which he claims contain exculpatory evidence. In the middle of the night between the second and third days of trial, the Commonwealth sent Shannon's counsel discovery which included approximately two hours of phone calls and fifteen screenshots of "Chirps"[3] Shannon sent and received while incarcerated awaiting trial. The following day, the trial court granted the defense's request to exclude the late-disclosed evidence from the Commonwealth's case-in-chief but left open the possibility the communications could be used for impeachment purposes if Shannon chose to testify. Shannon did not testify during the guilt phase but took the stand during the penalty phase.

On cross-examination, the Commonwealth asked Shannon whether he knew the gun was in the center console. Shannon denied knowledge of the

---

[2] Kentucky Rules of Criminal Procedure.

[3] Chirps are similar to text messages which inmates use to communicate with individuals outside the detention facility. Facilities contract with a private company to maintain the Chirp system.

gun. Upon realizing the Commonwealth was going to use the Chirps, defense counsel objected, arguing the Commonwealth should not be allowed to use them because of their untimely disclosure. The Commonwealth told the trial court they were going to use one Chirp to impeach Shannon on his knowledge of the gun. On this basis, the trial court overruled the objection and allowed the Commonwealth to proceed.

The Commonwealth then asked Shannon to read aloud a Chirp dated March 13, 2023 which stated,

> I got money for the phone I just need to add it on my card. I'll let u know when it's there tho but help u by telling u what happened that day I took that gun from terry[4] the day before y'll left because he kept pointing it at so *I put it in the console of the car bae. I didn't know that he was going to force you to take him you wouldn't have been driving period that's y I put the gun in the car.*

Emphasis added. Shannon told the Commonwealth the message was sent by his fiancée. The Commonwealth continued to interrogate the origin and implications of the Chirp:

> CW: It says sent, doesn't it? Where it talks about over here, does that say sent?
>
> MS: Inbound. It's the inbound text. That means incoming.
>
> CW: And on the other side here it says sent, is that right?
>
> MS: Yeah, on the other side it says sent, but it's the inbound text. . . . If you continue to read it, you'll see that it's the text. It's the incoming text.

---

[4] Terry, Shannon's fiancée's uncle, was the sole passenger in the car with Shannon on January 29, 2023.

5

CW: You were reaching for that gun, weren't you?

MS: No sir, I wasn't.

CW: In fact, you knew that gun was there. It was the only thing in that console. Isn't that true?

MS: I don't know what was in the console. I never searched the car when I . . . took the keys and drove it up here. I didn't search the car. I don't know what was in it.

Defense counsel then reasserted their objection to admission of the Chirp, arguing Shannon correctly identified the text as inbound.

The trial court observed that, because the Chirp was from someone who claimed to have put the gun in the console without Shannon's knowledge, "the problem because that it's potentially exculpatory for him and he didn't have it before trial." The court expressed concern that the Commonwealth's conduct might amount to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The court reserved its ruling, and allowed Shannon's testimony to proceed. On redirect, Shannon again testified his fiancée sent the Chirp and denied any knowledge of the gun in the console.

The court returned to the issue after a break. Defense counsel moved for a mistrial based on *Brady*. After hearing arguments from the parties, the trial court denied the motion by reasoning in relevant part,

> The text message . . . is potentially exculpatory to the defendant. It was disclosed . . . before we ended the trial. . . . However, this was a text message from an individual that was known . . . to the defendant. . . . And the defendant would have known what the testimony of the witness would have been and did not call this person as a witness who could have come in and testified and said all these things that were said in the text message. . . .

6

> I think that matters. I think that makes a difference. . . . Even though the message was somewhat exculpatory as it relates to the felon in possession of a handgun charge.

The trial court later denied Shannon's motion for a new trial on the same grounds.

Before we address the merits of Shannon's argument, we note that, despite the Commonwealth's arguments to the contrary before the trial court, it now concedes Shannon did not send the Chirp. It was sent by his fiancée. This is confirmed by our review of the record.

Shannon argues the Commonwealth's failure to timely disclose the Chirp from his fiancée was both a violation of *Brady* and a discovery violation – both of which entitle him to a new trial. We will first consider his argument under *Brady*. "Whether a *Brady* violation occurred is reviewed de novo." *James v. Commonwealth*, 360 S.W.3d 189, 197 (Ky. 2012). Furthermore, after Shannon was tried, this Court recognized that "every federal circuit court has held a *Brady* violation can be supported by tardy disclosure of evidence pretrial or during trial[,]" and held the same is true under Kentucky law. *Mills v. Commonwealth*, 718 S.W.3d 577, 583-84 (Ky. 2025). Therefore, the fact that the Commonwealth's disclosure of the Chirp occurred mid-trial does not bar Shannon's claim under *Brady*.

"There is no general constitutional right to discovery in a criminal case." *Porter v. Commonwealth*, 394 S.W.3d 382, 387 (Ky. 2011) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). However, in *Brady*, the Supreme Court of the United States held "the suppression by the prosecution of evidence

7

favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *James*, 360 S.W.3d at 197 (quoting *Brady*, 373 U.S. at 87). The Supreme Court has held the following three elements must be proven to establish a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Mills*, 718 S.W.3d at 583 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Shannon cannot establish a *Brady* violation because he fails to prove he was prejudiced by the Commonwealth's tardy disclosure of the Chirp from his fiancée. Constitutional error occurs only where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 582 (citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). Shannon argues that because he received the maximum sentence for the felon-in-possession offense, he must have been prejudiced by the Commonwealth's failure to disclose the Chirp until mid-trial.[5] However, Shannon's argument is unpersuasive considering that he was able to testify to the exculpatory nature of the text –that his fiancée placed the gun in the console without his knowledge –before he was sentenced. *After* hearing this testimony, the jury sentenced him to the maximum penalty.

---

[5] When the maximum sentence has been imposed by the verdict, prejudice is presumed. *Taulbee v. Commonwealth*, 438 S.W.2d 777, 779 (Ky. 1969).

8

Shannon does not explain how his trial strategy might have been altered or how the trial might have otherwise been different had the Commonwealth turned the Chirps over prior to trial. Without proof that there was a reasonable probability of a different outcome, we cannot find a *Brady* violation occurred.

Furthermore, because this matter pertains to a mid-trial disclosure, this Court has recognized that the typical consideration under *Brady* of whether there was a "reasonable probability of a different outcome at trial" can be ill-fitting. *Mills*, 718 S.W.3d at 585 (citing *United States v. Cloud*, 102 F.4th 968, 979 (9th Cir. 2024)). In practice, when a *Brady* violation arises mid-trial, the "customary remedy . . . is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses." *Id.* at 586 (quoting *United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010)). While this Court had not yet rendered the *Mills* decision when Shannon was tried, the trial court's remedy exceeded this standard. The court prohibited the Commonwealth from using Shannon's jail communications in its case-in-chief. Shannon did not testify until the following day during the penalty phase, when counsel should have known of the Chirp from his fiancée. Defense counsel did not request a continuance or allege they needed additional time to analyze the new evidence or alter their trial strategy. For example, Shannon has not argued that had the Commonwealth disclosed the Chirp earlier, he would have testified in the merits phase or called his fiancée as a witness. Therefore, the trial court provided Shannon an adequate remedy.

Shannon's argument that he is entitled to a new trial because the Commonwealth committed a discovery violation fails on the same grounds as his prior argument. "We review a trial judge's decision concerning discovery issues under an abuse of discretion standard." *Hilton v. Commonwealth*, 539 S.W.3d 1, 9 (Ky. 2018) (quoting *Brown v. Commonwealth*, 416 S.W.3d 302, 308 (Ky. 2013)). Trial courts have "broad remedial powers to address discovery violations." *Stieritz v. Commonwealth*, 671 S.W.3d 353, 368 (Ky. 2023) (quoting *Akers v. Commonwealth*, 172 S.W.3d 414, 477 (Ky. 2005)). RCr 7.24 governs discovery in criminal cases. Pursuant to this rule, the trial court entered a discovery order mandating that the Commonwealth provide discovery to defense counsel on or before the first status conference, including exculpatory evidence under RCr 7.24(5) and any "[o]ral, written, or taped incriminating statements of the defendant[.]"

> While the Commonwealth cannot claim ignorance in order to avoid an RCr 7.24(1) violation, this Court's refusal to excuse an unintentional discovery violation does not relieve a defendant from the burden of demonstrating sufficient resulting prejudice to justify reversal. Indeed, a discovery violation does not automatically mandate reversal. The reversal of a conviction for a discovery violation is warranted only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different.

*Stieritz*, 671 S.W.3d at 368 (citations and internal quotation marks omitted). A defendant suffers prejudicial error when a discovery violation "amounts to a surprise attack on an unsuspecting defense counsel's *entire defense strategy*." *Id.* (emphasis added) (quoting *Trigg v. Commonwealth*, 460 S.W.3d 322, 327

10

(Ky. 2015)). As explained above, Shannon has not shown how his defense strategy would have changed, or the trial would have been otherwise altered had the Chirp been disclosed in a timely manner. Therefore, the trial court did not abuse its discretion by allowing the Commonwealth to present the single Chirp during Shannon's penalty phase cross-examination.

Second, Shannon argues he is entitled to a new trial because the trial court declined to admonish the jury regarding who sent the Chirp. When the Commonwealth erroneously presented the Chirp from Shannon's fiancée as having been sent by him, defense counsel requested the trial court admonish the jury. When speaking with counsel, the trial court said, "It's an inbound text. I mean, his testimony says it and says it on there. So, I don't think he sent the text." However, it declined to admonish the jury because Shannon had already testified that he did not send the Chirp. The decision not to admonish the jury regarding the Commonwealth's misrepresentation of fact was erroneous. *Commonwealth v. Tramble*, 409 S.W.3d 333, 338-39 (Ky. 2013).

However, the trial court's error was harmless.

> The test for harmlessness is whether the error substantially swayed the verdict. The inquiry is not simply whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or one is left in grave doubt, the conviction cannot stand.

*Dixon v. Commonwealth*, 519 S.W.3d 396, 399 (Ky. 2017) (quoting *Allen v. Commonwealth*, 395 S.W.3d 451, 467 (Ky. 2013)). The Commonwealth's questioning of Shannon was relatively brief. Shannon was able to testify to the

11

correct facts on both cross-examination and redirect and, through his testimony, the jury was told that the message was sent by his fiancée. We are convinced that a reasonable jury understood this fact. *Tramble*, 409 S.W.3d at 339. Given these factors and the evidence against him, Shannon has not proven the trial court's failure to admonish the jury had substantial influence on his conviction for being a felon-in-possession.[6]

We now turn to Shannon's unpreserved arguments for which he requests review for palpable error under RCr 10.26.

> Palpable error is one easily perceptible, plain, obvious and readily noticeable. [T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law. Our focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process.

*Wahl v. Commonwealth*, 636 S.W.3d 484, 501 (Ky. 2021) (footnotes and internal quotation marks omitted). Reversal is mandated only when an error

---

[6] Although the parties do not address the issue directly, we note that the fact that the Chirp was sent by Shannon's fiancée, while favorable to him, would not have been determinative of his guilt of being a felon in possession of a firearm. To be guilty of the offense, the Commonwealth must prove a defendant was previously convicted of a felony and possessed a firearm. *Meyers v. Commonwealth*, 381 S.W.3d 280, 284-85 (Ky. 2012). "Possession may be proven through either actual possession or constructive possession." *Id.* at 285. In *Deboy v. Commonwealth*, 214 S.W.3d 926, 928 (Ky. App. 2007), a witness testified he borrowed the defendant's vehicle and placed three firearms in the vehicle, including one under the driver's seat, without Deboy's knowledge. "[P]roof that a defendant has possession and control of a vehicle is evidence to support a conviction for constructive possession of contraband found within the vehicle." *Burnett v. Commonwealth*, 31 S.W.3d 878, 880 (Ky. 2000), *overruled on other grounds by Travis v. Commonwealth*, 327 S.W.3d 456 (Ky. 2010). In *Deboy*, the Court of Appeals followed this reasoning and affirmed the trial court's denial of a directed verdict. *Deboy*, 214 S.W.3d at 930.

results in manifest injustice. *Jones v. Commonwealth*, 641 S.W.3d 162, 167

(Ky. 2022).

First, Shannon claims a comment made by the Commonwealth during

voir dire amounts to palpable error. Specifically, the Commonwealth told the

jury,

> So, just because a witness is a police officer, you don't
> automatically give them more credit. Just because they
> sit down with a uniform on, you don't go, yep, I'm in.
> However, after you hear about their training, their
> education, their experience, then you get to decide as
> the jury whether you're going to give that testimony
> more credibility than you would have originally. Like,
> they've earned it based on their experience and their
> training, and you can give more weight to what they're
> saying. Does that make sense? But it's not the badge
> alone that does it. Is that fair? Can we all agree on
> that?[7]

Shannon argues the result of these statements was "the entire jury panel

implicitly agreed that it could give more weight to officer testimony and find

them more credible." However, during voir dire, defense counsel said the

following to potential jurors:

> There's a lot of police officers are going to testify in this
> case but just because they are police officers doesn't
> mean that everything that they did was done properly
> or is not subject to challenge. I'm going to be in the
> position where I'm going to have to cross-examine police
> officers, which means I'm going to be challenging what
> they've done [and] challenging what they've said. Does
> anybody here think that they're going to have a problem

---

[7] On the video recording, the Commonwealth's Attorney is visible, but the jurors
are not. From our review of the video, it appears none of the jurors responded audibly
to her questions. However, we cannot say whether anyone nodded or otherwise
indicated agreement or disagreement to her questions. Shannon does not allege any
particular juror agreed or disagreed with her.

> hearing an authority figure that they've been taught to respect be challenged?

No juror indicated they would have such a problem.

The purpose of voir dire is to allow the parties and the court the opportunity to examine potential jurors to determine bias and impartiality. *Pelfrey v. Commonwealth*, 842 S.W.2d 524, 525 (Ky. 1992) (citing RCr 9.30); *Young v. Commonwealth*, 286 S.W.2d 893, 894 (Ky. 1955). "In order to determine if a juror has the appropriate degree of impartiality, [t]he test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Paulley v. Commonwealth*, 323 S.W.3d 715, 721 (Ky. 2010) (footnote and internal quotation marks omitted). If, through such examination, it is determined that "a prospective juror cannot render a fair and impartial verdict on the evidence," that juror must be excused for cause. *Pelfrey*, 842 S.W.2d at 525-56 (citing RCr 9.36).

Here, there was no palpable error. The Commonwealth told jurors they should not give an officer's testimony greater weight solely because of "the badge" and that decisions on credibility are ultimately up to them. This is true. *Saxton v. Commonwealth*, 671 S.W.3d 1, 10 (Ky. 2022) (holding "credibility determinations are the prerogative of the jury"). Despite his claim that the entire jury panel agreed with the Commonwealth, Shannon has failed to meet his burden of proving any juror showed any bias in favor of law enforcement. *Cook v. Commonwealth*, 129 S.W.3d 351, 357 (Ky. 2004). Defense counsel

14

asked jurors about potential bias and no juror expressed any bias or even a connection to law enforcement.

Furthermore, even if Shannon had shown a juror had some connection to law enforcement, this Court has routinely found trial courts did not abuse their discretion for failing to strike for cause jurors who are themselves current or former law enforcement officers or have close relationships to law enforcement officers. *Curry v. Commonwealth*, 620 S.W.3d 563, 572-73 (Ky. 2020) (juror's stepfather was chief of police); *Brown v. Commonwealth*, 313 S.W.3d 577, 597 (Ky. 2010) (juror was a police officer); *Penman v. Commonwealth*, 194 S.W.3d 237, 251 (Ky. 2006), *overruled on other grounds by Rose v. Commonwealth*, 322 S.W.3d 76 (Ky. 2010) (juror was married to a retired police officer); *Mills v. Commonwealth*, 95 S.W.3d 838, 842 (Ky. 2003) (juror was formerly a police officer); *Young v. Commonwealth*, 50 S.W.3d 148, 163 (Ky. 2001) (juror was a National Guardsman who worked with a police task force). Because Shannon has failed to present any proof of bias or even a juror's connection to law enforcement, we can find no error.

Next, Shannon argues the trial court's admission of Officer Johnson's victim impact testimony was palpable error. During the guilt phase, Officer Johnson testified to seeing the Dodge Ram's wheel come off during the pursuit of Shannon. The Commonwealth asked him what he was thinking about at that time. Officer Johnson became visibly upset as he testified, "Due to my accident the previous year, it's pretty terrifying to think that the guys that I work with and that I love are going to get hurt. I lost my daughter in 2022

15

because of wet roads." Defense counsel objected to relevance. The trial court offered to admonish the jury, but defense counsel declined.

This Court has previously held that if an error can be cured by jury admonition and a defendant fails to request an admonition, we will not review the error. *Graves v. Commonwealth*, 17 S.W.3d 858, 865 (Ky. 2000) (citations omitted). Here, Shannon not only failed to request an admonition but also declined relief when the trial court offered it. Therefore, we will not review any alleged error in Officer Johnson's guilt phase testimony.

During the penalty phase, Officer Johnson testified as the "spokesperson" for the officer-victims. He testified nearly continuously for approximately thirty minutes with only a few brief interruptions for questions from the Commonwealth. He was often visibly emotional during his testimony but not excessively so. *See Elery v. Commonwealth*, 368 S.W.3d 78, 97 (Ky. 2012).

First, he described his role as a training officer as being like a parent and said "[w]hen [new officers] mess up, it can be fatal. . . . The way the academy does it is if you talk the right way to everybody, then you never have any problems, and there's never a reason for you to be the mean police officer. In the real world, that's not the way it works."

Officer Johnson then testified to an unrelated traffic stop involving Officer Thacker.

> The instance that I am talking about previously, [Officer Thacker] watched a man continuously reach down beside his leg. When I walked up and she's telling him to step out, . . . first she asked him to step out, then she

16

told him to step out, then she gave a direct order for him to step out. Every time he told her, no, I'm good. At that point, I took over the traffic stop, ran up, jerked the door open, and when I opened the door, there's a .45 caliber gun in his door. I jerked him out of . . . the vehicle. She asked me how I knew how to do that. It's because of working with all the guys I work with, we learn off of each other. So we try to relay that to the younger officers. So, when one of the other officers that you work with, we become a family, because it's my responsibility, the sheriff has more experience than I have, it's still my responsibility to make sure he goes home to his family at night. So you begin to build that bond and relationship where you have to protect each other.

He then began to testify about the events of this case. He testified to his feelings when he received the call for assistance in the pursuit of Shannon:

So, in my mind, it was, I have to get to [the officer] as fast as I can get there. Then when he, then when I heard over the radio that he said, 'he hit me, he hit me.' Then I got scared that he was hurt, because five months prior, I had, and it was raining this night, so now I'm driving at an extremely high rate of speed trying to get to him. I didn't know other officers were with him, because I went into audio exclusion. I was only hearing what was on the radio, I wasn't paying attention to whose voices it was.

He then described the car accident in which his daughter was killed:

So, five months prior, I took my family to the water park, the day before school. And it started raining really hard, and I lost control of my vehicle. I went across the interstate and was hit by a semi. My 11-year-old daughter was killed, and the rest of us spent two weeks in UK hospital. In the back of an ambulance, one of the guys that I trained very first time, when I was at Carlisle, Lieutenant Lewis Boyer, I called him from the back of the ambulance. And he could hear me, he could hear the sirens, and he said, 'What's wrong?' And I said, 'We've been in a bad wreck. I need you.' So, Officer Boyer called our . . . chief and told him what was going on. And he sent officers to all the hospitals where they were taking my children. And . . . Officer Boyer stayed

17

with Raelyn until our family could get there, and they could pronounce her. And then in UK, Lieutenant Boyer, Officer Craycraft, and the rest of my department stood in the hallway while they stood at my bedside. And Lewis knew the news that I was getting ready to be told, but he couldn't tell me. But they were the ones that were there for me at the hospital through everything. Every day, and every day since then, I get calls.

Officer Johnson then returned to describing the pursuit of Shannon and describes the Dodge Ram as the "same as the Dodge pickup that I wrecked[.]" He continued to describe his thoughts and feelings when he approached the Dodge Ram.

Yes, it had lost its back rear wheel. Those are four-wheel drive trucks. If he'd have pulled it in four-wheel drive, he'd have ran right over top of me. I just didn't... never thought about that. While we're breaking the window out of the truck, he still has his foot on the gas, roasting the tire off of it. So now we're reaching into a truck that is still trying to go forward. I want to go home to my little boy. I want my friends to go home to their kids. . . . I've had to go to people's houses and tell them their family's not coming home anymore. It's the worst part of our job. I sure don't want to have to go tell one of my . . . friend's wives or their kids that their daddy's not coming home or their mommy's not coming home anymore because of what we're doing out here.

Officer Johnson went on to testify to the difficulties of being a police officer generally.

So, the other officers asked me to do this because, as officers, we're taught that we put everything in the box. And we put it away. We don't show any emotion. We're never supposed to get mad. We're not supposed to cry. Every one of them has seen me cry. But sometimes our box overflows. You can only put so much in.

He then had the following exchange with the Commonwealth:

CW: How has this affected you since then?

18

OJ: I have nightmares. It's . . . both because of my wreck and because of things that I do. I have nightmares. I don't sleep at night. That's why I volunteer to work night shift. My relationships fell apart since my wreck and since this has all happened.

CW: Was this a part of that?

OJ: No, my relationships mostly from my wreck. It was her daughter and that's been hard. But that had fell apart and then I pretty much raised my boy. I have a three-year-old son. And I kept thinking I have to get back home to Lincoln. I have to get home to my boy.

CW: While this was going on?

OJ: Like I said, I pride myself on being a good driver. I've been in very, very high-speed pursuits and always been fine. But like I said, the tires are exploding and chunks of the wheel are coming off. All it takes at 85, 95 miles an hour is for me to run over a piece of that metal and blow a steer tire out and I'm off the road and in a ball of flames going down the side of the road. There's nothing anybody can do for you at that. You wreck at those speeds and it's going to be the fire departments there trying to cut you out of that vehicle.

Well, there's so much equipment in our cars that usually the officers don't get hurt from the wreck. It's the equipment that's flying through the car that smacks you in the face. I mean, we've got computers, guns, bag equipment that's, you know, you've got a bag sitting in your seat, but it's full of recorders and different pieces of equipment. It's things that you have to have every day. So, you don't put that in your trunk because you have to have it right now. Well, then if you wreck, it hits you in the face. So, pursuits are one of the most dangerous things we do for both us and for the public.

CW: At one point when I was just kind of talking to you about this particular case, you relayed something

to me about Officer Thacker and your training with her?

OJ: So, after the pursuit was over, I was . . . told by other officers when I realized that during the pursuit, I thought Thacker was with me. Because I saw a white Dodge Charger, and I saw a black Durango. I knew that Parker had already been in a wreck. Thacker's the only one that had a black Durango. So, I went over, and I asked Helvey, I said, 'Where's Thacker?' And he said, 'She's at the hospital.' And I said, 'Why is she at the hospital?' 'She had a medical emergency and had to go be taken to the hospital.' So, I then proceeded back to Bourbon County to go get him, . . . Mr. Shannon, medically cleared. Got him into the hospital and handed him over to other officers, and I walked into her hospital room. And she's very hard on herself. She . . . worries about what everybody else thinks about her. She worries about, did she do it right? And especially the guys that if I wasn't her training officer. But as an older officer, your job, even though you're not the training officer for that person, you still want to make sure that they're safe and that they learn. Because we learn from everybody. Usually in the training program, . . . they have at least two to three different training officers because they learn something from everybody. My strong point has never been my paperwork. I've always struggled. I don't . . . type the best. So that's been my downfall. I'm more of an aggressive officer that goes out and looks for DUIs and drugs and finds things like that. And then the other officers that are with me will help me type the cases and make it sound good so that I don't sound like a bumbling idiot on paper. But when I walked into her room, I went over and she was laying in the bed and she got teary eyed and she said, 'You were right.' And I said, 'What do you mean?' And she said, 'I got that feeling.' And I said, 'What do you, tell me?' And she said, 'I knew something was wrong. And as soon as I got other officers there, I went to get him out of the car, jerk him out of the car. There was a gun in the glove box. That's what he kept sticking his hand into.' And I said, 'So you got that feeling.' And we call it

20

the tingle up your neck. You know, you just get that something's not right. I don't know what it is yet, but something's not right. And she told me, she said, 'I remembered that traffic stop that we worked on.' The night after that traffic stop that I was explaining, I got with the . . . other older officers and we took our three new officers out to a private parking lot and we ran through scenarios because, like I said, in the academy, they tell you, 'Sir, if you put your hands on the steering wheel, everything's fine.' And then you go through your traffic stop and nothing bad ever happens. So, we went out there and unloaded all our guns. We all checked to make sure they were all safe. And then I told the other officers, I said, they don't get a win tonight. Everything, I don't care how good they talk to us, everything they do is wrong because we're going to get away. So, we even laid guns on dashes, and they weren't noticing the guns on the dashes. You know, they were looking down where guns normally are. So, then we showed them how bad it could go really fast. And they were like, so then we started videoing it, and so we could show them how they approach the vehicle. Just to show them how bad things can go, even though you're doing the right thing. And so then she cried to me and she's like, 'I'm so glad we went out there and did all that extra training.' It's something that simple that can turn a night of, hey, I'm going to work to, hey, you know things just went to an area we can't ever come back from. And it happens every, I think there's a statistic, it's like every 53 hours there's a police officer that's killed. That's not keeping track of how many of us are shot or break their legs. I've had . . . my back, I've got bulging discs now because of a guy that pulled a gun on me. I've had my arm broken, my shoulder separated. So you take those experiences and you try to relay that to the younger officers so that they never have to go through that. And they're like, . . . for lack of better terms, they're like a child. They have to find out for their selves. Just like you teach your kids, you raise them up and you teach them the best you can, they still have to figure it out on their own. And when they . . . do figure it out and you have a moment like that where she's able to tell me, 'Hey,

21

you were right, that's why I'm still here.' That's a pretty good feeling to know that, hey, she got it. She gets to go home. She gets to go to her fiancé and their kids. You know, she's a secondary mother or a stepmother to five other children and she helps raise them and spend time with them and she got to survive that night. . . . In the end, we all got to go home. But it's the manner and what it took from us before we got back there.

CW: One other question. As an officer in either Paris or Carlisle, what do you see your role as far as to the public?

OJ: Protect them. . . . As a police officer, you like to believe, not that you're invincible, but that if I do all the right things, that everything will be okay. It's not always the case. Just like in my wreck, I was doing less than the speed limit. I wasn't texting. I wasn't doing anything. They reconstructed my wreck. They've downloaded everything. But I couldn't stop what happened. God had a plan and that's what happened. But as police officers, we like to believe that we can come in and we can fix things or make them better and that we will listen. Sometimes my listening skills aren't the best. Sometimes people like the younger officers that I'm trying to train will have to say, 'Hold on, let's look this way and think this.' So, then we have to learn too. We're continuously learning. But as a police officer, you try to be the guy that everybody can depend on. And since my wreck, I'm not always the guy you can depend on because you all see me cry. Sometimes there are situations that I'm now going to that I can't deal with. And other officers will step up in front of me and take over to help me get through it. The emotional part gets me. But I think that's why my box is now overflowing is because I deal with great guys, men and women that care about their community. And they want to be out here helping and do things that make a difference and make things better for everybody . . . so that your kids, grandkids, family can be safe.

Officer Johnson then closed his testimony by returning to his thoughts about Kentucky law:

> And in Kentucky, the way the law is written now, if we're in a pursuit, even though we were justified to chase after him, if something happens, I can be held liable personally. . . . So, if he wrecks into somebody, now I'm getting sued. And then I'm going to a whole different kind of court because now I'm the one on trial because of the actions that came from the pursuit that I had to go on. So that . . . messes with your head really bad. Because I don't have anything. You can't get blood from a turnip, but you can sure make my life awful to sit in court and feel like . . . I've done something that I shouldn't have done or to live with. . . we're out here to protect people. If somebody gets hurt during a pursuit, that's not going to be something I want to live with either.[8]

During the penalty phase, the Commonwealth may present victim impact testimony to inform the jury of "the specific harm caused by the crime in question[.]" *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). However, the subject matter to which a victim may testify is constrained by statute. *Johnson v. Commonwealth*, 680 S.W.3d 814, 825 (Ky. 2023) (holding KY. CONST. § 26A does not broaden the statutory scope of victim impact testimony). Such testimony may include "a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims[.]" KRS 532.055(2)(a)(7). "[T]he purpose of [the victim impact statement] is to give the jury an understanding of the impact of the crime being tried, not the defendant's bad character or overall negative effect on society[.]" *Gaither v.*

---

[8] Earlier in his testimony, Officer Johnson also mentioned that, in Kentucky, officers' "hands are tied" in chases because they cannot "just ram [a] vehicle and take [it] off the road."

*Commonwealth*, 521 S.W.3d 199, 207 (Ky. 2017) (quoting *St. Clair v. Commonwealth*, 451 S.W.3d 597, 625 (Ky. 2014)). If a victim impact statement contains evidence "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne*, 501 U.S. at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986)).

Shannon acknowledges that Officer Johnson was entitled to testify about the impact the events in the case had on him, but he claims the testimony went far beyond what was admissible under KRS 532.055(2)(a)(7). In addition to his testimony about the psychological harm the officers suffered that night, Officer Johnson testified at length about the following: (1) an unrelated car accident in which his stepdaughter was killed five months earlier; (2) an unrelated traffic stop conducted by Officer Thacker in which a suspect drew a gun; (3) training exercises he conducted to show new officers the dangers of traffic stops; (4) the general dangerousness of the job and the possibility of him and his fellow officers not going home to their families; and (5) his thoughts about Kentucky's laws and the possibility that he could be civilly liable for his conduct during a chase.

In the context of a capital murder case, this Court has reasoned that a victim "can be identified as more than a naked statistic, and statements identifying the victims as individual human beings with personalities and activities do not unduly prejudice the defendant or inflame the jury." *Bowling v. Commonwealth*, 942 S.W.2d 293, 302 (Ky. 1997) (citing *McQueen v.*

24

*Commonwealth*, 669 S.W.2d 519, 523 (Ky. 1984)), *overruled on other grounds by McQueen v. Commonwealth*, 339 S.W.3d 441 (Ky. 2011). Here, Officer Johnson was certainly entitled to testify to any emotional harm he suffered as a result of Shannon's actions. He could also humanize the experience of being a police officer in pursuit of a suspect for the jury so that they could better understand the nature and extent of that harm. However, the above-listed portions of his testimony far exceeded contextualization. It did nothing to help the "jury to assess meaningfully [Shannon's] moral culpability and blameworthiness." *Payne*, 501 U.S. at 825. It also did not aid the jury in "the assessment of harm caused by [Shannon] as a result of *the crime charged*[.]" *Id.* at 819 (emphasis added). Instead, this irrelevant testimony served only to prejudice the jury against Shannon.

However, we cannot find that admission of Officer Johnson's testimony was palpable error because there is no probability of a different result considering the clear evidence against Shannon justifying his twenty-year sentence. Overwhelming evidence proved Shannon committed theft, a Class C felony,[9] when he took the Dodge Ram despite being handcuffed and led the police on a high-speed chase through multiple counties, which separately constituted the Class C felony of first-degree fleeing or evading police[10] and the Class D felony of second-degree escape.[11] The circumstances of the chase itself,

---

[9] KRS 514.030(2)(g).

[10] KRS 520.095(2).

[11] KRS 520.030(2).

including Shannon's ramming of another police vehicle, clearly support his convictions for first-degree wanton endangerment[12] and first-degree criminal mischief,[13] both Class D felonies. Evidence then clearly established that he at least constructively possessed the handgun in the console, which is also a Class C felony.[14] Together with the misdemeanor offenses of which he was convicted,[15] the cumulative minimum sentence he could have served, if his sentences ran consecutively, would have been mere days from the twenty years he is currently serving because of the statutory cap. KRS 532.020; KRS 532.080(6)(b). Therefore, considering the statutory cap and the overwhelming evidence against Shannon, we cannot find that there is any meaningful possibility that he would have been sentenced to less than twenty years absent Officer Johnson's irrelevant testimony.

Finally, Shannon argues the Commonwealth's questions regarding his civil lawsuit against the Paris Police Department during the penalty phase was irrelevant and prejudicial. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it could be without the evidence." KRE[16] 401. However, otherwise relevant evidence "may be excluded if its

---

[12] KRS 508.060(2).

[13] KRS 512.020(2).

[14] *See* cases cited *supra* note 6; KRS 527.040(2)(a).

[15] KRS 218A.1422(2); KRS 508.070(2).

[16] Kentucky Rules of Evidence.

probative value is substantially outweighed by the danger of undue prejudice[.]" KRE 403.

In the penalty phase, the defendant is entitled to "introduce evidence in mitigation or in support of leniency[.]" KRS 532.055(2)(b). Expressions of remorse qualify as such evidence. However, like any other mitigation evidence, the Commonwealth is entitled to present evidence to rebut a defendant's assertions of remorse. *Johnson v. Commonwealth*, 103 S.W.3d 687, 697 (Ky. 2003) (finding no error when Commonwealth rebutted defendant's claims of regret by arguing his actions immediately following the crimes showed a lack of remorse); *see also Neal v. Commonwealth*, 95 S.W.3d 843, 853 (Ky. 2003).

Here, Shannon testified that he felt remorse for his crimes against law enforcement officers. On cross-examination, the Commonwealth questioned him about his civil lawsuit against law enforcement to rebut his claims of regret.[17] This evidence is relevant to the jury's determination of whether to grant leniency. KRE 401. This probative value is not substantially outweighed by prejudice to Shannon. KRE 403. The Commonwealth was entitled to present evidence to urge the jury to reject Shannon's claim of remorse. *Johnson*, 103 S.W.3d at 697. Therefore, there was no error, palpable or otherwise.

## **CONCLUSION**

Based on the foregoing, the judgment of the Bourbon Circuit Court is affirmed.

---

[17] The Commonwealth also briefly mentioned Shannon's testimony about the civil lawsuit in its closing argument.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Kathleen Kallaher Schmidt
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Ryan D. Mosley
Assistant Attorney General